UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                                              20-CR-113-LJV
     v.                                          DECISION & ORDER

DAREN LEWIS,

        Defendant.

_____

The defendant, Daren Lewis, has pleaded guilty to a one-count indictment

charging him with possessing at least 500 grams of methamphetamine with the intent to

distribute that substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A).  Docket Item

53; *see* Docket Item 11 (indictment).  He now argues that he is eligible for a "downward

deviation" from the mandatory minimum sentence and a two-level reduction in his

offense level because he qualifies for relief under the "safety valve" provision in 18

U.S.C. § 3553(f) and United States Sentencing Guidelines ("Guidelines") Manual §

5C1.2.  Docket Item 69.  The government responds that Lewis is not eligible for safety

valve relief because he did not provide "all information and evidence [he] had

concerning the offense," a prerequisite for such relief.  Docket Item 72; 18 U.S.C. §

3553(f)(5).

Both sides have submitted several briefs addressing whether Lewis provided

truthful and complete information to the government.  Docket Items 69, 72, 81, 82, 95,

97, 98.  In addition, this Court conducted an evidentiary hearing, *see* Docket Items 78,

86, 92, and heard oral argument, *see* Docket Item 99.  For the following reasons, the

Court finds that Lewis meets the safety valve requirements.

## BACKGROUND

### I.    FACTUAL BACKGROUND[1]

Lewis began transporting marijuana several years before becoming involved in the offense here.  Docket Item 88 at 16.  At first, Lewis was only a courier: he delivered up to 20 pounds of marijuana by car up to twice a week, and he received several hundred to a thousand dollars per delivery as payment.  *Id.* at 16-17.  But starting in 2018, Lewis "t[ook] a more active role" in "[s]hipping [] marijuana and selling it for [] profit," and he traveled to California five or six times to facilitate larger shipments.  *Id.* at 18, 22.  On those trips, he purchased marijuana, vacuum sealed the marijuana and placed it in a cardboard box, packed it in a shipping pod with furniture, and shipped it across the country.  *Id.* at 19-20.  Lewis made approximately $15,000 per trip.  *Id.*

During one of those trips in early 2020, Lewis was approached by a friend, Alex Meadows, who "asked [] if [Lewis] wanted to do a shipment for somebody."  *Id.* at 22.  Lewis assumed that the shipment involved marijuana because Meadows "knew that's all [Lewis] would deal with" and because "marijuana comes from California."  *Id.* at 24-25.  Meadows gave Lewis a phone to communicate with the source of supply coordinating the transaction.  *Id.* at 23.  According to Lewis, he did not know—and did not ask—who the source was; Lewis trusted his friend Meadows and understood that "higher-level drug dealers" often "want to be anonymous."  *Id.*

---

[1] The following facts are taken primarily from Lewis's testimony.  *See* Docket Item 88.  Although the Court found Lewis to be credible, the Court does not assume the truth of those facts for the purpose of evaluating Lewis's eligibility for the safety valve. Instead, the Court evaluates the credibility of the hearing witnesses and testimony as noted below.

The source contacted Lewis via text message, but the two never spoke on the phone or met face to face.  *Id.* at 24.  Lewis and the source agreed that Lewis's fee for the "first shipment" would be $5,000 "plus expenses"; "then[,] if it went well, . . . it would be more" for future shipments.  *Id.* at 24-26.

The source told Lewis to go to California "to pick [up the shipment] and then ship it."  *Id.* at 26.  When Lewis arrived in California, the source "told [him] to pick up . . . a burner phone."  *Id.* at 27.  Lewis obtained another phone and provided the number to the source; he then received a text message telling him to go to a gas station, where he met two men.  *Id.*  Lewis did not believe that either of the men was the source who was coordinating the transaction.  *Id.* at 27-28.  After Lewis followed the two men in his vehicle as he was instructed, both vehicles pulled over, and Lewis and the men "quickly transferred [two] boxes into [Lewis's] vehicle."  *Id.*  Lewis later loaded the boxes into a shipping pod.  *Id.* at 30-31.  Lewis did not notice anything unusual about the boxes: he handled them quickly, they did not have an odor, and they were the same type of boxes he usually used to transport marijuana.  *Id.* at 28-31, 65.

Later, in July 2020, Lewis traveled to Tonawanda, New York to pick up the shipment.  *Id.* at 35.  One of the boxes had opened in the pod, and Lewis "noticed that . . . it was very dense."  *Id.* at 36.  But he was "focused on getting [the shipment] and then dropping it off as soon as [he] could," so he did not pause to think about what the box contained.  *Id.*  He "loaded [the boxes] into [his] truck," pulled onto the street, and was stopped by law enforcement a short time after.  *Id.* at 35.

After Lewis was arrested, he spoke with the arresting agents.  *Id.* at 36.  Lewis falsely told the agents that a stranger in a park had recruited him to pick up the drugs in

3

Tonawanda.  *Id.* at 37.  But Lewis provided the agents with "the pass codes for all the phones" in his possession and "told them what was supposed to happen once [he] picked up the delivery."  *Id.*

The boxes contained approximately 60 pounds of methamphetamine, *id.* at 44, which was worth about $2.7 million, Docket Item 76 at 123.  Lewis testified that had he known the shipment was methamphetamine, he would not have participated because there was "too much risk involved."  Docket Item 88 at 45.  He also testified that he has never transported any drugs other than marijuana, *id.* at 16, and that he has no experience with methamphetamine "whatsoever," *id.* at 36.

## II.   PROCEDURAL HISTORY AND LEWIS'S PROFFER

Lewis was indicted for possessing with intent to distribute at least 500 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A).  Docket Item 11. The mandatory minimum sentence for that crime is 10 years' imprisonment.  *See* Docket Item 50 at ¶ 1.  On June 3, 2021, Lewis pleaded guilty to the charge, and the Court accepted his plea.[2]  Docket Item 53.

A few months later, on September 13, 2021, Lewis "participated in a safety valve interview with HSI [Homeland Security Investigations] and the United States Attorney's Office (USAO)."  Docket Item 72 at 15-17 (report of safety valve interview).  During that proffer, Lewis described, *inter alia*, his past experience transporting marijuana; the role of his friend, Alex Meadows, in recruiting Lewis for this shipment; and how Lewis shipped the methamphetamine.  *Id.*

---

[2] Lewis did not enter into a plea agreement with the government.  *See* Docket Item 57 at 4.

On March 31, 2022, Lewis filed a sentencing memorandum arguing that he is eligible for the safety valve, Docket Item 69, and on April 8, 2022, the government responded, Docket Item 72.  In essence, Lewis claimed that he was truthful and complete in his proffer to the government, and the government disagreed.

The Court therefore conducted an evidentiary hearing on the question of whether Lewis provided complete and truthful information to the government during the proffer.  *See* Docket Items 76, 78.  Lieutenant Richard Long, a retired Massachusetts State Police officer who spent his 29-year career in narcotics investigations, testified for Lewis.  Docket Item 76 at 12-78.  Special Agent Christopher Oswald, who has worked for HSI for 13 years and who now works primarily on "narcotics distribution cases and gang enforcement activities," testified for the government.  *Id.* at 87-151.  Special Agent Edward Williams of the Department of Homeland Security also testified for the government.  *Id.* at 152-96.

The parties then filed post-hearing briefs, Docket Items 81, 82, and Lewis asked the Court to reopen the evidentiary hearing so that he could testify, Docket Item 81. After the Court granted that request, Docket Item 85, Lewis testified on September 19, 2022, Docket Items 86, 88.  On December 19, 2022, the evidentiary hearing continued and Detective Paul Glejzer, who works for "the vice narcotics division in the Burlington[, Massachusetts] Police Department," testified for the government.  Docket Items 92, 93. The parties then submitted additional briefing, Docket Items 95, 97, 98, and on March 31, 2023, this Court heard oral argument, Docket Item 99.

## LEGAL PRINCIPLES

18 U.S.C. § 3553(f) includes a "safety valve" provision that "permits the imposition of a sentence below the mandatory-minimum sentence prescribed in an underlying-offense statute." *United States v. Jimenez*, 451 F.3d 97, 98 (2d Cir. 2006). A defendant qualifies for the safety valve if:

> (1) the defendant does not have [more than 4 criminal history points;]
>
> . . .
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense . . . and was not engaged in a continuing criminal enterprise . . . ; and
>
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan . . . .

18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2. A defendant must establish each of those criteria by a preponderance of the evidence. *United States v. Conde*, 178 F.3d 616, 620 (2d Cir. 1999).

The only criterion at issue here is the fifth: whether Lewis provided to the government "all information and evidence [he] has concerning the offense." *See* Docket Item 50 at ¶ 6; *see also* Docket Item 81 at 2-4. To satisfy that requirement, the defendant "must prove both that the information he . . . provided to the [g]overnment was objectively true and that he . . . subjectively believed that such information was true." *United States v. Reynoso*, 239 F.3d 143, 146 (2d Cir. 2000) (emphasis omitted).

6

A defendant's prior "lies and omissions do not disqualify [him] from safety valve relief so long as the defendant makes a complete and truthful proffer not later than the commencement of the sentencing hearing." *United States v. Schreiber*, 191 F.3d 103, 108-09 (2d Cir. 1999).

"[W]hen the record, taken as a whole, will not support a finding that the defendant has failed to provide a truthful and complete proffer, the government's lack of confidence in the proffer is insufficient, in and of itself, to justify a denial of access to the safety valve." *United States v. Marquez*, 280 F.3d 19, 24 (1st Cir. 2002); *see United States v. Aidoo*, 670 F.3d 600, 606 (4th Cir. 2012) (quoting *Marquez*); *United States v. Barron*, 940 F.3d 903, 919 (6th Cir. 2019) (quoting *Marquez*).

## DISCUSSION

The government says that Lewis does not qualify for the safety valve because he "failed to provide complete and truthful information" about three subjects: (1) "his knowledge concerning the presence of methamphetamine in the shipment"; (2) "his knowledge regarding the source of the supply for the methamphetamine"; and (3) "the details surrounding his compensation for shipping the methamphetamine from California to New York." Docket Item 72 at 4-5. The Court addresses each of those topics in turn.

## I.      LEWIS'S KNOWLEDGE OF THE DRUGS' IDENTITY

During his safety valve proffer, Lewis told the government that he believed he was shipping marijuana and that he did not know the boxes he shipped contained methamphetamine. Docket Item 69 at 6. The government insists that Lewis did not

believe he was shipping marijuana.  *See* Docket Item 72 at 7-8.  But Lewis has met his burden of showing he was truthful about what he thought he was shipping.

First, Lewis has distributed marijuana in the past, and he admitted as much to the agents who arrested him.  Docket Item 69 at 10-11; Docket Item 95 at 25.  In fact, Lewis testified that he distributed *only* marijuana—not other drugs—prior to this incident, and that he has no experience with methamphetamine "whatsoever."  Docket Item 88 at 16, 36.  The Court found that testimony to be credible, and the government's evidence offers nothing to the contrary.

Moreover, Lewis's testimony and proffer statement both are consistent with his post-arrest statement, in which he "emphatically" told the agents that he did not know the boxes contained methamphetamine.  *See* Docket Item 95 at 25.  The Court therefore is convinced that Lewis dealt only marijuana before this incident, and it accepts Long's testimony that marijuana dealers are unlikely to deal in other narcotics due to the higher risk associated with those drugs.  Docket Item 76 at 31-32.  So this Court believes Lewis when he says that he believed that he was shipping marijuana.

Lewis's relationship with Meadows—who recruited him for the shipment— supports that conclusion.  Lewis credibly testified that Meadows knew that Lewis dealt only in marijuana and that Meadows had helped Lewis source marijuana previously. Docket Item 88 at 24-25, 59.  In fact, when Meadows approached Lewis about the shipment at issue in this case, Meadows "mentioned marijuana."  Docket Item 69 at 11. So it was understandable for Lewis to think that Meadows had recruited him for a marijuana shipment.

Furthermore, this Court agrees with Lewis that "[n]othing about the nature of [this] offense suggests that [Lewis] knew—or even should have known—that the boxes he shipped contained anything other than marijuana." *Id.* Long testified that the drugs' place of origin—California—is consistent with marijuana, Docket Item 76 at 34-36, and that marijuana is shipped more often than more valuable drugs due to the high risk of loss, *id.* at 27-28. He also testified that when marijuana is shipped, it is "usually just wrapped in a cardboard box," *id.*, like the drugs in this case. Additionally, as the arresting agent noted—and as government witness Oswald agreed—the "vacuum-sealed packages" in the boxes were "consistent with a common method used to package marijuana and other illegal narcotics for [bulk] trafficking." *Id.* at 130. In fact, Lewis had shipped marijuana in vacuum sealed packages in cardboard boxes before. Docket Item 88 at 19. So the method of packaging and shipping the drugs in this case provides "a good faith basis" for Lewis's belief that he was transporting marijuana. Docket Item 69 at 11.

Contrary to the government's suggestion during the evidentiary hearing, *see* Docket Item 76 at 53-54, the lack of any marijuana odor was not a "red flag[]" that should have tipped Lewis off to the drugs' identity, *see id.* at 71. Long and Oswald both testified that marijuana distributors can mask the smell of marijuana by vacuum sealing it, *id.* at 55, 125, and Lewis testified that he "would never be able to smell marijuana" when he shipped it because he vacuum sealed the drugs, Docket Item 88 at 19. It stands to reason that high-level marijuana shippers—as Lewis presumably thought he was dealing with here—would go to great lengths to conceal any odor that might reveal

what was being shipped.  So there is no reason to disbelieve Lewis solely because the boxes did not smell of marijuana.

The government also argues that Lewis must have known the boxes did not contain marijuana based on the "common[ ]sense that approximately 60 pounds of marijuana would take up substantially more space than 60 pounds of methamphetamine."  Docket Item 72 at 8.  But vacuum sealed marijuana is denser than loose marijuana, *see* Docket Item 76 at 124, and Lewis handled the boxes only briefly and did not pause to think about their contents, Docket Item 88 at 28-31, 65.  So while a physics student taking an exam may have had reason to conclude that the boxes were too heavy to contain marijuana, that does not give this Court pause in accepting what appeared to be credible testimony by Lewis.

What is more, Lewis testified that he previously had shipped 50 pounds of marijuana in two or three cardboard boxes.  *Id.* at 62.  This shipment of 60 pounds of drugs in two cardboard boxes was therefore not much—if at all—different than Lewis's past experience with boxes of marijuana.  So it certainly is plausible that Lewis—who had never "dealt with or touched methamphetamine" before, *id.* at 63—did not realize the boxes contained methamphetamine based on their density.

The government also says that Lewis simply is not credible.[3]  Docket Item 97 at 7-10.  It argues that Lewis's "claim that he believed the boxes at issue contained

---

[3] Relatedly, the government argues that the Court should consider the results of a polygraph that the government administered to Lewis, which indicated Lewis knew he was shipping methamphetamine.  Docket Item 72 at 6-7.  But Lewis argues that the government's polygraph examination was flawed, and he submitted another polygraph examination conducted by a private examiner that indicated he did not know he was shipping methamphetamine.  Docket Item 69 at 8-10.  In light of those contradictory results, the Court does not give weight to either polygraph exam and instead bases its

marijuana is self-serving," Docket Item 72 at 8, because, as Lewis acknowledged during his testimony, methamphetamine trafficking carries a higher penalty than marijuana trafficking, Docket Item 88 at 49-50.  The government also notes that Lewis previously told lies to protect himself, such as telling the arresting agents that he had never shipped drugs cross-country before.  Docket Item 97 at 7-8.

The government's argument makes some sense as it pertains to Lewis's post-arrest statement: faced with an uncertain penalty, an individual who has not yet been charged might well lie about his conduct to minimize that penalty.  But even at his proffer—with the benefit of legal counsel to explain the consequences of lying to the government—Lewis maintained that he did not know he was shipping marijuana.

And Lewis has very little to gain—but much to lose—by lying.  By lying, Lewis risks a mandatory minimum penalty of ten years in prison and stands to gain only some possible incremental benefit from the Court's viewing his crime differently because he was unaware of what was in the boxes he shipped.  His maximum penalty will not change based on his belief about the drugs' identity.  His Guidelines range will not change based on his belief about the drugs' identity.  The fact that he shipped 60 pounds of methamphetamine while engaging in what he knew was the crime of transporting drugs will not change based on his belief about the drugs' identity.  So his sentence may not be very different regardless of whether he knew he was shipping methamphetamine or thought it was some other illegal substance.

---

analysis on other evidence, including the credible testimony Lewis provided before this Court.  *See* Docket Item 72 at 9 (the government's request that "this Court assess the defendant's credibility for itself by inviting the defendant to testify at a sentencing hearing and subjecting him to the time-tested crucible of cross-examination").

Viewed together, Lewis's testimony and the other factors discussed above establish by a preponderance of the evidence that Lewis provided complete and truthful information about his belief in the identity of the drug he shipped.[4]  Therefore, his proffer on that topic is no reason to deny safety valve relief.

## II.   LEWIS'S KNOWLEDGE ABOUT THE SOURCE OF SUPPLY

The government argues for several reasons that Lewis failed to provide complete and truthful information about the source of supply of the methamphetamine.  *See* Docket Item 72 at 5.

First, the government contends that Lewis's insistence that he "knew nothing about the identity of the [s]ource of [s]upply . . . belies all common sense," *id.*, and "is so unbelievable, on its face, that law enforcement does not believe it to be complete and truthful, even in the absence of a smoking gun," Docket Item 81 at 13-14.  More specifically, it says that a source would not trust "a complete stranger with a shipment valued at 2.5 million dollars."  Docket Item 72 at 5.  Indeed, Oswald testified that the amount of methamphetamine that Lewis shipped "seemed like a lot" to transport cross-country without some "trust" between the source and the transporter.  Docket Item 76 at 116.  And Lewis testified that the source did not ask him for tracking information for the

---

[4] Lewis makes a separate argument that "his knowledge of the substance is ancillary" to the offense at issue—"possess[ion] with intent to distribute a controlled substance that was indeed methamphetamine"—and therefore does not affect his eligibility for the safety valve.  Docket Item 82 at 13-14.  That argument makes some sense: unlike information about the identity of the source of supply, information related to Lewis's belief about the drug's identity likely would not impact the government's investigation.  Regardless, the Court need not reach that argument because it finds that Lewis honestly believed he was shipping marijuana.

shipment "or any of the specifics" about how he planned to transport the drugs.  Docket Item 88 at 83-84.

Nevertheless, there is little evidence that Lewis knew the source of supply.  Lewis believes that the source trusted him because the source trusted Lewis's friend Meadows, who trusted and recruited Lewis.[5]  *Id.* at 45; *see* Docket Item 95 at 24 (arguing that "it appears highly likely that the source trusted Alex Meadows to connect him with a person with whom [] Meadows had placed his confidence").  Presumably, if Lewis had absconded with the drugs, the source could have found him through Meadows.

Moreover, both Long and Oswald testified that sources often conceal their identities from others involved in their operations.  Docket Item 76 at 37 (Long's testimony); *id.* at 146 (Oswald's testimony).  While Oswald was skeptical that "the extent of the interaction" between Lewis and the source "was basically an exchange of boxes between two vehicles on a street" as Lewis had described, *id.* at 117, Long felt otherwise: he testified that it is "common" to obtain product from someone "met in the street" so that the person transporting the drugs cannot "get too personal" with the source, *id.* at 37.  Indeed, the source may well have kept his distance from Lewis to avoid the risk of identification if Lewis were arrested—that is, exactly what happened

---

[5] For that reason, the government's reliance on *United States v. Jordan*, 2021 WL 4940818 (11th Cir. Oct. 22, 2021), is misplaced.  *See* Docket Item 81 at 13.  In *Jordan*, the Eleventh Circuit affirmed the district court's finding that the defendant failed to establish the truth of his proffer, during which he told the government that a stranger at an airport gave him $60,000 to $70,000 worth of cocaine.  *Jordan*, 2021 WL 4940818, at *2-3.  The district court thought the defendant must have "some additional information because . . . drug mules have some connection to the organization even if they are provided with as little information as possible."  *Id.* (internal quotation marks omitted).  Here, Lewis's relationship with Meadows is just such a connection.

here.  So despite the high value of the methamphetamine, Lewis's contention that he did not know the identity of the source rings true.

The government also suggests that Lewis's unwillingness to provide details about the source indicates deception.  Docket Item 81 at 11-12.  Oswald, who was present for Lewis's proffer, described Lewis as "reluctan[t] to tell the whole truth and be forthcoming" about the source's identity.  Docket Item 76 at 110.  He specifically testified that Lewis was unwilling to provide "[c]ontact information" or "basically anything to further [the government's] investigation" into the source.  *Id.* at 112.  But Lewis's apparent reluctance has another explanation: he simply did not have the information the government wanted.  And unlike Oswald, this Court did not find Lewis to be less than "forthcoming."[6]

Furthermore, Lewis provided information about other individuals involved in the transaction, suggesting his willingness to cooperate with the government and share the information he possessed.  Most notably, Lewis named and described Meadows at the proffer, Docket Item 72 at 16, even after he had lied to protect his friend during the post-arrest interview, Docket Item 88 at 55-56.  As Lewis's attorney argues, "[t]he provision of difficult information about his friend certainly supports [Lewis's contention that he] told the truth and provided complete information at the proffer."  Docket Item 95 at 24-25.  And, in fact, the government eventually "determined [that Meadows] exists and corroborated some information supplied by [] Lewis," further suggesting the truth of Lewis's proffer.  *Id.*; *see* Docket Item 88 at 3.

---

[6] That is not to say that this Court disbelieved Oswald.  On the contrary, this Court found Oswald to be credible.  This Court simply assessed Lewis's credibility differently.

Lewis also provided a description of the two men whom he met in California. Docket Item 76 at 113.  That description was limited—Lewis said the men spoke English well and may have been Hispanic, *id.*—but Lewis met the men "briefly on the street corner," Docket Item 98 at 9, so it is understandable that he could not provide additional details.  Because Lewis was willing and tried to provide information about individuals involved in the shipment—including his close friend—it seems unlikely that he would withhold information about the source.

The government also focuses on TD, a "close personal friend" of Lewis, Docket Item 88 at 91, who worked with Lewis on a marijuana transaction in Burlington, Massachusetts, in May 2020, Docket Item 95 at 12 (citing Docket Item 88 at 32-35).[7] During Lewis's proffer, the government asked him about TD because "location data found in [Lewis's] iPhone [showed that Lewis] immediately went to [TD's house] upon his return from California" after he shipped the drugs.  Docket Item 72 at 17; Docket

---

[7] The government places a great deal of weight on the Burlington transaction, Docket Item 97 at 8-11, during which Detective Glejzer observed Lewis and TD exchange bags, one of which contained marijuana, *see* Docket Item 93 at 6-22.  Lewis testified that he remained silent during the interaction with Glejzer.  Docket Item 88 at 71-73.  Glejzer, on the other hand, testified that "both" Lewis and TD "denied" that they had exchanged the bags.  Docket Item 93 at 11-15.

According to the government, Glejzer's testimony establishes that Lewis's testimony was untruthful and thus undermines Lewis's credibility.  Docket Item 97 at 8-9.  Lewis, on the other hand, suggests that Glejzer's recollection of the Burlington incident is faulty.  Docket Item 95 at 28-29.

But even if Glejzer's testimony is accurate, it is possible that Lewis—who testified more than two years after the Burlington incident—did not remember the denials he purportedly made to Glejzer.  What is more, the Court cannot discern why Lewis would lie about his interaction with Glejzer—a relatively low-stakes situation compared to the instant criminal proceedings.  *See id.*  So the Court believes that Lewis's testimony about the Burlington incident, while perhaps inaccurate, was not intentionally untruthful.

Item 76 at 121.  During the proffer, Lewis "claimed he did not remember going there but insisted that [TD] was not involved in the [m]ethamphetamine shipment."  Docket Item 72 at 17.  Lewis later testified that after he returned from California, he went to TD's house for a Fourth of July barbecue.  Docket Item 88 at 33-34.  But he repeated that TD had "no involvement" in the methamphetamine shipment "whatsoever."  *Id.*

Oswald, who was present for the proffer, did not believe that TD was not involved with the shipment.  Docket Item 76 at 121.  But other than Oswald's assessment and the location data from Lewis's phone, the government presented no evidence that TD was involved with the methamphetamine shipment.  *Id.* at 143-44; *see* Docket Item 95 at 30 (arguing that the government's contention that TD was involved in the methamphetamine shipment is based "upon pure speculation").  And the location data from the phone—showing that Lewis went to a friend's house on the Fourth of July after he returned from a trip to California—hardly suggests that friend's participation in the drug transaction that was the purpose of the trip and therefore gives the Court no reason to doubt the truthfulness of Lewis's statement that TD was not involved.

Finally, the government makes much of the untruthful statements in Lewis's post-arrest interview, arguing that those lies undermine the credibility of Lewis's proffer about the source.[8]  Docket Item 81 at 13-14.  But the Court rejects that argument, which would pave the way for the government to reject safety valve proffers from any defendant who initially lied to protect himself or someone else.

---

[8] Lewis admitted that he initially lied to protect himself and his friend, Meadows.  *See, e.g.*, Docket Item 88 at 37, 52-56.  But even Oswald acknowledged that people often lie to protect others, Docket Item 76 at 133, and he admitted that it may have been difficult for Lewis to name Meadows, *id.* at 137.

A defendant's prior lies "do not disqualify [the] defendant from safety valve relief," *Schreiber*, 191 F.3d at 108-09, especially because motives for lying or telling the truth might change at different stages of the investigation and criminal proceedings.  Here, those motives gave Lewis good reason to lie initially to protect himself and his friend but later to tell the truth at his proffer to obtain the benefit of the safety valve.  And based on this Court's assessment of Lewis's credibility at the hearing, that is exactly what he did.

For all those reasons, Lewis has established by a preponderance of the evidence that he told the government all he knew about the source of supply.

### III.   LEWIS'S COMPENSATION

Finally, the government argues that Lewis did not provide complete and truthful information about the compensation he agreed to receive for facilitating the methamphetamine shipment.  Docket Item 72 at 8-9.

At his proffer, Lewis told the government that the source agreed to pay him $5,000 plus expenses for shipping the drugs.  *Id.* at 16.  The government argues that $5,000 is such a low figure that it is "inconsistent with common[ ]sense" for two reasons. *Id.* at 8-9.  First, it notes that Lewis paid out of pocket for the costs associated with the shipment, including the cost of his trip to California.  *Id.*  The government contends that it would be "illogical" to spend that money up front for a relatively low return.  *Id.* Second, it notes that Lewis previously was paid $15,000 for marijuana shipments—a much higher fee for a comparable amount of work moving a less valuable product.  *Id.*; *see* Docket Item 76 at 126 (Oswald's testimony that "it . . . didn't make a whole lot of sense" for Lewis to accept "about a third of what he was making on his own" shipping marijuana "doing the same thing with people that he had no experience with").

17

It is true that Long testified that someone transporting drugs other than marijuana likely would expect more than $5,000 in payment, given the risk involved.  Docket Item 76 at 35.  But as discussed above, Lewis did not believe he was shipping methamphetamine.  *See supra* at 7-12.  In fact, Lewis testified that he would not have agreed to ship methamphetamine for $5,000 because the reward would not have been worth the risk.  Docket Item 88 at 45.

And Lewis provided two credible reasons why he agreed to accept an unusually low fee.  First, he thought that this shipment would lead to future shipments; in other words, he viewed it as an investment.  *Id.* at 24-26.  Any savvy businessman might consider doing work on the cheap to get a lot more work down the road.  Second, Lewis said that like many others, he needed the money during the pandemic.  *Id.* at 67.  Those are plausible explanations for the $5,000 fee.

Lewis also testified that had the government been able to retrieve his communications with the source from his phone, those communications would have verified his payment amount.  *Id.* at 114-15.  Lewis's willingness to turn over his passcode supports that assertion.  *See* Docket Item 95 at 25-26.

Ultimately, the government provides nothing more than its own arguments to doubt Lewis's statement about the fee.  So given the circumstances surrounding the transaction and the credibility of his testimony, Lewis has proven by a preponderance of the evidence that he provided complete and truthful information to the government about his compensation for the shipment.

## **CONCLUSION**

At its core, the government's arguments boil down to a hunch that Lewis is not telling the truth.  But this Court has more than a hunch that the government is incorrect.  The Court saw Lewis and the other witnesses testify and evaluated their credibility.  And based on all the proof, the Court finds that Lewis qualifies for safety valve relief.

For the reasons stated above, the Court finds that Lewis has established by a preponderance of the evidence that he "has truthfully provided to the [g]overnment all information and evidence [he] has concerning the offense" at issue.  *See* 18 U.S.C. § 3553(f).  He therefore is eligible for a two-level reduction in his Guidelines offense level and the opportunity for a downward deviation from the mandatory minimum sentence.

A sentencing date will be set by the Court.


SO ORDERED.

Dated:   September 7, 2023
         Buffalo, New York


_____
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE